Cora D. Metz, Transferee v. Commissioner. Estate of Mary Douglas, Deceased, Cora D. Metz, Executrix v. Commissioner. John F. Douglas, Transferee v. Commissioner.
Metz v. Commissioner
Docket Nos. 24572, 24573, 25162.
United States Tax Court
1951 Tax Ct. Memo LEXIS 78; 10 T.C.M. (CCH) 970; T.C.M. (RIA) 51302; October 4, 1951
*78 The petitioners' decedent, Mary Douglas, effected certain common and preferred stock transfers in 1932 and 1939 to petitioners, Cora D. Metz and John F. Douglas. Mary Douglas died on June 23, 1945. Held: The stock transfers were not made in contemplation of death within the meaning of section 811 (c), I.R.C.
William J. Rielly, Jr., Esq., 915 Mercantile Library Bldg., Cincinnati 2, Ohio, John N. Gatch, Esq., and Frank A. Roberts, Esq., for the petitioners. John O. Durkan, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion In these consolidated proceedings the petitioners seek redetermination of a deficiency in estate taxes against the Estate of Mary Douglas, Deceased, and her transferees, *79 in the amount of $211,410.59. The transferees have agreed by stipulation that they are liable as transferees for any deficiency determined against the estate. The petitioners have waived all objections to the respondent's determination except with respect to 2,067 shares of common stock and 187 shares of preferred stock of The John Douglas Company, transferred by Mary Douglas to the transferees. The transfers in controversy occurred as follows: Date
Shares
Kind
Transferee
Oct. 11, 1932
1,434
Common
Oct. 10, 1932
17
Pfd.
Cora D. Metz
Oct. 13, 1932
83
Pfd.
Cora D. Metz
Mar. 9, 1939
633
Common
John F. Douglas
Oct. 5, 1939
77
Pfd.
Cora D. Metz
Oct. 5, 1939
10
Pfd.
John F. Douglas
The transfers of these shares were determined by respondent to constitute transfers "in contemplation of or intended to take effect in possession or enjoyment at or after death." Findings of Fact The stipulated facts are so found and made a part hereof. Petitioners in these consolidated proceedings are Cora D. Metz, Transferee, the Estate of Mary Douglas, Deceased, and John F. Douglas, Transferee. The estate tax return here involved was filed with the *80 collector of internal revenue at Cincinnati, Ohio. John Douglas (hereinafter called John) was the founder and president of The John Douglas Company (hereinafter sometimes called The Company) of Cincinnati, Ohio, which company was incorporated under the laws of Ohio in 1890. At the date of his death, March 23, 1930, his survivors were as follows: Age as of
March 23, 1930
Mary F. Douglas, wife (hereinafter sometimes referred to as Mary)
68
Charles E. Douglas, son (hereinafter referred to as Charles)
49
Cora D. Metz, daughter (hereinafter referred to as Cora)
47
John F. Douglas, grandson (hereinafter referred to as Jack)
21
Richard L. Metz, grandson (hereinafter referred to as Richard)
22
Mary Alice Thomas, granddaughter (hereinafter referred to as Mary Alice)
20
Mary is the decedent whose estate is a petitioner in these proceedings. Cora and Jack, son of Charles, likewise are petitioners in these proceedings. Ralph Douglas (hereinafter referred to as Ralph), son of John and Mary, died in January, 1928. Richard and Mary Alice are the children of Cora. John had retired from the active management of The Company in 1923, and he and Mary had moved to *81 Pensacola, Florida, leaving his son-in-law, C. W. Metz, in charge. His grandsons, Richard and Jack, were employed there at the time of his death. E. W. Thomas, Jr., husband of the granddaughter, Mary Alice, became employed there in 1933. The outstanding common stock of The John Douglas Company consisted of 3,500 shares. Prior to July 8, 1921, all of the common and 87 shares of the preferred stock were owned by John. One hundred shares of preferred stock were owned by Ralph. The 3,500 shares of common stock were transferred, as follows: Transferred
Date
No. of Shares
From
To
7/8/21
500
John
Ralph
500
John
Cora
6/20/32
500
Ralph
Mary ( [1] )
3/23/30
834
John
Mary ( [2] )
833
John
Charles ( [2] )
833
John
Cora ( [2] )
1932
100
Charles
Mary ( [3] )
9/24/32
633
Charles
Mary ( [4] )
10/11/32
1434
Mary
Cora
3/9/39
633
Mary
Jack
4/25/40
500
Cora
Jack
12/25/40
114
Cora
Mary Alice
114
Cora
Richard
3/19/41
200
Cora
Mary Alice
200
Cora
Richard
12/19/41
100
Charles
Metz ( [5] )
12/20/41
200
Cora
Mary Alice
200
Cora
Richard
50
Metz
Mary Alice
50
Metz
Richard
8/14/43
15
Cora
Jack
11/ 1/44
1
Cora
Mary Alice
1
Cora
Richard
1
Cora
Jack
*82 These transfers resulted in the common stock of The John Douglas Company being owned, as follows, on or about November 1, 1944: No. of
Shares
Cora
1,121
Mary Alice
615
Richard
615
Jack
1,149
*83 John, at the time of his death, owned 131 shares of The Company's preferred stock. These shares were transferred from his estate, as follows: Persons
No. of
Date
Receiving
Shares
6-23-31
Mary
87
6-23-31
Cora
44
TOTAL
131
In addition to the 87 shares received from John's estate, Mary received 100 shares (the total holding) from Ralph's estate. Mary disposed of her 187 shares thus acquired by transfer, as follows: Persons
No. of
Date
Receiving
Shares
10-10-32
Cora
17
10-13-32
Cora
83
10- 5-39
Cora
77
10- 5-39
Jack
10
187
On or about November 1, 1944, Cora and Jack owned 177 and 10 shares, respectively, of the preferred stock of The John Douglas Company. This class of stock had the right to vote whenever dividends thereon were in arrears. In May of 1935 Mary made a gift of an undivided two-thirds interest in Florida real estate to Cora, the owner of the other one-third interest, and in December of 1937 she made cash gifts of $10,000 each to Jack, Richard and Mary Alice. Gift tax returns were filed by Mary for the years 1935, 1937 and 1939 reporting these gifts and disclosing no net gifts and no gift tax *84 liabilities. The son, Charles, was genial and personable but had proved very improvident and unreliable to the great distress of John and Mary. This instability of Charles had been recognized by John as early as 1921. In that year he gave 500 shares each of The Company's common stock to Cora and Ralph as an incentive, but gave none to Charles. Charles had been given many opportunities to work his way up in his father's company. Each time he had gotten into trouble involving himself and the company, resulting in his having been discharged. Metz opposed the repeated rehiring of Charles but was forced to defer to the wishes of John. Shortly before his death, John was on the verge of once more reinstating Charles when he discovered that Charles had borrowed $3,000 from a company salesman and had not repaid it. Upon learning this John became very angry; stated he would not put Charles back in the business; and ejected Charles and his second wife from the cottage he, John, had provided for them on his Florida estate. Shortly following this episode John died of a heart attack which the family felt might have been brought on by his quarrel with Charles. John had a will which disappeared *85 prior to his death. The Douglas family could not account for its disappearance. At the time of John's death, Metz had been entrusted with the complete management and control of the factory and business for a period of seven years. Jack and Richard had also been employed by The Company in various capacities for some time. Mary, the widow, had never been so employed and had no knowledge of the plumbing business. The Company sustained major losses each year from 1926 through 1938. It had been at times a leader in the plumbing industry, was well established, and had a good reputation. It had periodically been a source of wealth to the entire Douglas family group consisting of John, Mary, their children and grandchildren. The reputation of The Company was such that after it was sold to the Briggs Manufacturing Company it continued to be operated under its established name, The John Douglas Company. Mary and John were residing in Pensacola, Florida, when the latter died. Cora and Metz immediately went there and, together with Mary, made arrangements for his burial in Cincinnati. Arrangements were also made for Mary to make her future home with the Metz family in Cincinnati. John *86 carried insurance policies on his life totaling $100,000. He had made Metz beneficiary of the policies, with an oral trust in favor of his wife. He also possessed substantial holdings in real estate and securities in addition to his stock in The Company. He and Mary were sole next of kin of their son, Ralph, who had died in 1928 but whose estate was still unsettled due to a will contest. A discussion between Mary and Metz respecting the disposition of The John Douglas Company stock which she would inherit from her husband's and her son Ralph's estates, took place the day after the funeral services in Pensacola which Metz and Cora had come to attend. As a result of the discussion Mary had Metz prepare an agreement for the disposition of such stock. This agreement was later rewritten in the form of two instruments embodying the same terms, for the addition of Jack's signature. These instruments provided that: "Cincinnati, Ohio. July 3-1930 "In consideration of one Dollar and other valuable considerations to me in hand paid by Cora D. Metz of Cincinnati, Ohio the receipt whereof is hereby acknowledged, I Mary Douglas of Pensacola, Florida do hereby sell, assign, transfer, and convey *87 to the said Cora D. Metz - All the stock of The John Douglas Co. of Cincinnati, Ohio that I may legally come into possession of through my rights of inheritance in the estates of my deceased husband John Douglas of Pensacola, Florida and my deceased son Ralph J. Douglas of Covington, Kentucky and I therefor do hereby agree to transfer to Cora D. Metz my stock of the John Douglas Co. that may later be issued to me at the time of the legal distribution of the above referred to estate of John Douglas and Ralph Douglas. "In witness whereof I have hereunto affixed my hand and seal this third day of July 1930. "(S) Mary Douglas "Witnessed July 3, 1930. (S) John F. Douglas "The agreement made with my daughter Cora D. Metz July 3-1930 to transfer to her stock in the John Douglas Co. which I may inherit from my husband John Douglas is made with the purpose and intention that my daughter during her life time be under all circumstances in full control of the John Douglas Co. but it is understood and agreed between us that my three grandchildren will finally come into possession of an equal number of shares of Common Stock of the John Douglas Co. "(S) Cora D. Metz "(S) Mary Douglas. *88 "Witnessed July 3, 1930. (S) John F. Douglas." At the time these instruments were executed Mary reiterated her statements about wanting to avoid responsibilities in connection with the business with which she was inexperienced and about which she had little knowledge. She was also concerned over the fact that Charles would be coming into possession of a sizeable block of The Company's stock by virtue of his sharing in John's estate. She wanted immediate control centred in Cora whom she felt was better able to cope with Charles Charles had been a constant source of worry to his parents and neither had ever given him any company stock. He had never asked for it and they were not desirous that he acquire any. He had been content periodically to ask for reinstatement as an employee of The Company. Subsequent to John's death, Charles was re-employed by The Company and worked for it approximately two years. At the time the above instruments were drawn, Mary also expressed her wish that the business be continued for the benefit of her grandchildren. She particularly wanted those who were working in The Company to know that the stock was theirs or to become theirs so they would have *89 an incentive to make the business succeed. In July, 1932, Mary and her two children executed an agreement whereby Mary should receive the entire estate of Ralph, and would thereafter make settlement with the children for their respective interests. This agreement was attached to and became a part of an order of the court directing Ralph's administrator to distribute his estate to Mary. Among Ralph's assets which were distributed to her pursuant to this agreement, were 500 shares of common and 100 shares of preferred stock of The Company. On October 11, 1932, following the settlements of the estates of John and Ralph, Mary transferred the 1,334 shares of company common stock received therefrom to Cora in accordance with the agreements which she had theretofore executed. As noted above, 100 shares of The Company's preferred stock were also transferred to Cora at about the same time. Charles had inherited 833 shares of common stock of The Company from his father and immediately dissipated it. He used 100 shares to pay a debt due his mother, bought furnishings in New York, pledging another 100 shares for that debt, and borrowed $16,500 from The Central Trust Company of Cincinnati, *90 pledging as collateral therefor the remaining 633 shares. Mary paid the bank and thereby acquired the 633 shares collateral; Metz paid the New York debt and received the 100 shares collateral, At the same time the 1,334 shares were transferred to Cora, Mary transferred an additional 100 shares of those thus acquired by her from Charles. She retained 633 of such shares from 1932 until 1939. On March 9, 1939, she transferred them to Jack pursuant to the following agreement: "TRUST AGREEMENT "Mary Douglas hereby irrevocably grants, transfers, conveys and assigns six hundred thirty-three (633) shares of common stock of The John Douglas Company to her grandson, John F. Douglas. It is agreed that said stock shall be transferred on the stock records of said Company, and certificate or certificates for same shall be issued in the name of said John F. Douglas. "Said John F. Douglas agrees to hold said stock in trust during the lifetime of grantor's daughter, Cora D. Metz, and to pay to said Cora D. Metz all the income therefrom during her lifetime. At the death of said Cora D. Metz said stock shall belong completely and entirely to said John F. Douglas. "During her lifetime said Cora *91 D. Metz may on request take and keep possession of such certificate or certificates in the name of John F. Douglas, and said John F. Douglas agrees to deliver possession of same to said Cora D. Metz on request. The benefits to and obligations upon said John F. Douglas as provided herein, shall inure to and be binding upon said John F. Douglas, his heirs, executors, administrators and assigns, and the provisions of this agreement shall apply to said stock and its proceeds or any property which might be exchanged or substituted therefor. It is further agreed that said stock may be sold, exchanged or otherwise disposed of by said Trustee during the life of said Cora D. Metz only by and with the consent of said Cora D. Metz, and it is further agreed that the proceeds of sale or exchange of said stock in case same shall be sold or exchanged, shall be held or reinvested by said Trustee in any form or manner or in any property which may be agreed to by said Cora D. Metz and said John F. Douglas. "It is further hereby provided and said John F. Douglas agrees that during the lifetime of said Cora D. Metz said stock shall be voted by said Cora D. Metz, and he agrees to give her proxies from *92 time to time for said purpose. "Said John F. Douglas and Cora D. Metz by their signatures hereto accept said stock subject to the trusts and conditions herein expressed. "The Grantor's reasons for making this gift are that she wishes to see said beneficiaries enjoy the ownership of said property while she is still living, and that she further wishes to insure while living that substantially all the voting power of said Company shall be placed and maintained in said Cora D. Metz, believing that this is for the immediate best interests of the Company. "IN WITNESS WHEREOF said donor, Mary Douglas, and said beneficiaries, John F. Douglas and Cora D. Metz, have hereunto set their hands at Cincinnati, Ohio, this 9th day of March, 1939." "(Signed) John F. Douglas Mary Douglas Cora D. Metz." "Witness: (S) B. G. Focks G. W. Coppin" On or about November 1, 1944, the stockholders of The Company, as of that date, sold their common stock to the Briggs Manufacturing Company for a consideration of $304.64 per share. Cora received the commuted value of her life interest in Jack's shares. Mary was generally in a good state of mental and physical health from 1929 to 1940; was not under *93 the care of a physician for any chronic or acute illness; had suffered no ailment or sickness endangering the state of her health; and during such period she remained normally active, cheerful and interested in her daily affairs and in the interests of her family, friends and others about her. Mary died June 23, 1945, leaving a will which she had executed February 26, 1941. There is no evidence that she had made a will previous to this date. We make the following additional or ultimate findings: The common and preferred stock transfers effected by Mary Douglas in 1932 and 1939 were not made in contemplation of death. Opinion VAN FOSSAN, Judge: This case presents the single issue whether certain stock transfers made by decedent, Mary Douglas, were made in contemplation of death within the purview of section 811 (c) of the Internal Revenue Code. [1]
*94 The question of whether particular transfers were made in contemplation of death is purely one of fact. The answer is to be found by determining the dominent motive which impelled them. If it be the thought of death, the transfers are considered as having been made in contemplation thereof. City Bank Farmers Trust Co. v. McGowan, 323 U.S. 594. The phrase "contemplation of death" does not mean that there need be an apprehension by the transferor of his impending or imminent death. Rather, if the motivating cause be to accomplish thereby a testamentary disposition of property, then the transfer falls within the meaning of that phrase as it is used in the statute. United States v. Wells, 283 U.S. 102. On the other hand, such meaning does not include or embrace those transfers prompted by "purposes associated with life." United States v. Wells, supra. Here there exists no statutory presumption favoring respondent's determination inasmuch as the latest of the disputed transfers took place approximately six years prior to decedent's death. The question posed must be answered on its merits on the proof adduced. At the time of John Douglas' *95 death, March 23, 1930, The Company was in dire financial straits. Its recovery would require strong management with intelligent planning and application of efficient and consistent policies. Despite his earlier retirement, John Douglas had always been available to give experienced advice on major questions of policy and had always kept a firm hand in The Company, as is evidenced by his overriding of Metz's objection to the rehiring of his son, Charles. Accordingly, John's death brought on something of a crisis in The Company. Mary Douglas was inheriting a sizeable block of stock in a business about which she had little knowledge and in which she had no experience. Added to her problem was the knowledge that her son Charles was also inheriting a considerable quantity of such stock. This would result in the stock of The Company being held by herself, Cora, and the improvident Charles. She was in a quandary. If she maintained the status quo she would be obliged to take on the unwanted responsibility that such stock ownership would trust upon her, and to assume the distasteful burden of dealing with her son Charles which was certain to be unpleasant. Furthermore, she would be hazarding *96 the consequences of a possible split in management and policy which the business could ill afford at that time. Rejecting this arrangement as a solution to her problem she was left with two alternatives. The first was liquidation of the business or outright sale of her stock for whatever price it would bring. This method as a possible solution was ruled out because there was a great family pride in The Company's history and an ardent desire to make it once more a successful business. As pointed out above, the achievement of such success would require consistency in management, and an incentive in the young family employees to work diligently to this desired end. She chose to solve her problem by centering stock control of the business in her daughter, Cora, whose husband was president and in active charge thereof and whom she thought better able to cope with Charles. She sought to supply the necessary incentive to the younger family members by giving stock to Cora with the understanding that it should finally go to the three grandchildren. Accordingly, shortly following John's death, Mary executed agreements leading to such an arrangement. In view of the facts set forth, we have *97 arrived at the conclusion that the agreements, pursuant to which the transfer to Cora was made, were associated with the purposes of life rather than effected in contemplation of death. That Mary had acquired substantially all of Charles' inheritance shortly prior to the date the transfer was made, is not significant. Also of little significance is the fact that Charles was employed by The Company for approximately two years following his father's death. If anything, these facts highlight Cora's better competency in coping with Charles. It is to be noted that his stock interest ceased and his final discharge from The Company took place in the same year that the transfer of stock control to Cora was effected pursuant to the earlier agreements. We turn now to consideration of the 1939 transfer of 633 shares of stock to Jack subject to Cora's life interest therein. The record shows that by 1939 The Company had been re-invigorated and gave promise of becoming once more a financial success; that these shares were 633 of the ones previously inherited by Charles; and that they were given as a reward to Jack to whose efforts much of The Company's recent progress could be attributed. Furthermore, *98 the transfer was merely a continuation of Mary's original plan of keeping The Company within the family and the primary motive of providing and rewarding the incentive of her grandchildren who contributed to its success. After thorough consideration of all the evidence, it is our conclusion that the common and preferred stock transfers to Cora in 1932 and 1939, and those to Jack in 1939, were motivated by purposes associated with life, and that they were not made in contemplation of death within the meaning of section 811 (c), supra. Although in the notice of deficiency respondent stated that the transfers in question were made either in contemplation of death or to take effect in possession or enjoyment at or after death. On brief he abandons the latter ground and states "The only issue is" contemplation of death. We deem it unnecessary to discuss this abandoned issue. Decisions will be entered under Rule 50. Footnotes
1. Received from the estate of Ralph Douglas. ↩
2. Received from the estate of John Douglas. ↩
3. In consideration of a debt owed by Charles E. Douglas to Mary F. Douglas. ↩
4. Stock pledged by Charles E. Douglas to The Central Trust Co. of Cincinnati, Ohio, for a loan. Mary F. Douglas paid the principal and interest on the loan in the amount of $16,780.50, as consideration for the transfer of the stock from Charles. The certificate representing these shares was cancelled by Mary F. Douglas on 3/9/39 and a new certificate for the same number of shares was issued to John F. Douglas. ↩
5. Stock pledged by Charles E. Douglas to the John Wanamaker Co., New York, N. Y., as collateral for a personal debt. C. W. Metz, husband of Cora D. Metz, paid this debt as consideration for the transfer from Charles. The certificate for these shares was cancelled on 12/20/41 and two new certificates, each for 50 shares, were issued to Mary Alice Thomas and Richard L. Metz, respectively.↩
1. SEC. 811. GROSS ESTATE. [As amended by sec. 7 of Public Law 378, 81st Cong., known as the "Technical Changes Act of 1949" and made applicable to the estates of decedents dying after February 10, 1939.] * * *
(c) Transfers in Contemplation of, or Taking Effect at, Death: (1) General rule: To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) by trust or otherwise - (A) in contemplation of his death; or (B) under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (i) the possession or enjoyment of, or the right to the income from, the property, or (ii) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; or (C) intended to take effect in possession or enjoyment at or after his death. (2) Transfers taking effect at death - transfers prior to October 8, 1949: An interest in property of which the decedent made a transfer, on or before October 7, 1949, intended to take effect in possession or enjoyment at or after his death shall not be included in his gross estate under paragraph (1) (C) of this subsection unless the decedent has retained a reversionary interest in the property, arising by the express terms of the instrument of transfer and not by operation of law, and the value of such reversionary interest immediately before the death of the decedent exceeds 5 per centum of the value of such property. For the purposes of this paragraph, the term "reversionary interest" includes a possibility that property transferred by the decedent (A) may return to him or his estate, or (B) may be subject to a power of disposition by him, but such term does not include a possibility that the income alone from such property may return to him or become subject to a power of disposition by him. * * *↩